In re HATFIELD HOMES, INC., d/b/a
Oak Woods East, Debtor.

HATFIELD HOMES, INC., Plaintiff,

v.

PENNVIEW SAVINGS ASSOCIATION
Elizabeth Wolf Raymond Butera and
Theodore Mignatti, Defendants.

Bankruptcy No. 82–04133G.
Adv. No. 83–0543G.

United States Bankruptcy Court,
E.D. Pennsylvania.

June 6, 1983.

Edward J. Hollin, Stanford S. Hunn Associates, Lansdale, Pa., for plaintiff/debtor, Hatfield Homes, Inc. d/b/a Oak Woods East.

Neil Conver, Lansdale, Pa., for defendant, Pennview Sav. Assn.

Arnold E. Cohen, Philadelphia, Pa., for defendant, Elizabeth Wold.

Stuart N. Cohen, King of Prussia, Pa., for defendants, Raymond Butera and Theodore Mignatti.

Robert H. Levin, Adelman, Lavine, Krasny Gold & Levin, Philadelphia, Pa., for Union Nat. Bank and Trust Co. of Souderton, objectors.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge:

The issue before us is whether we should grant the debtor's complaint to sell its real property free and clear of the defendants' liens. We conclude that said complaint should be denied because the proposed sales price does not, in our view, represent the highest possible sales price for the property in question.

The facts of the instant case are as follows:[1] On September 2, 1982, Hatfield

---

**1.** This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

Homes, Inc., d/b/a Oak Woods East ("the debtor"), filed a petition under chapter 11 of the Bankruptcy Code ("the Code"). The debtor's principal asset is real property consisting of twenty-five one-half acre building lots located in Hatfield Township, Montgomery County, Pennsylvania ("the property"). The aforesaid property is encumbered by a first mortgage held by Pennview Savings Association ("the first mortgagee"), a second mortgage in the name of Elizabeth Wolf ("the second mortgagee") and a third mortgage held by Raymond Butera and Theodore Mignatti ("the third mortgagees"). The debtor has entered into a proposed agreement of sale to sell the property in question to Sal Lapio, Inc. ("the buyer") for the sum of $388,000.00, which amounts to $15,520.00 per lot. On February 28, 1983, the debtor filed the instant complaint to sell the subject property free and clear of liens pursuant to section 363 of the Code. While said complaint was unopposed by the first mortgagee, both the second and third mortgagees objected to the proposed sale and filed timely answers to the debtor's complaint.[2]

Section 363(f) of the Code provides:

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of such interest;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to ac-

cept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 1107(a) of the Code provides:

(a) Subject to any limitations on a trustee under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

11 U.S.C. § 1107(a).

Moreover, *Collier on Bankruptcy* states:
In applying the Code it will be necessary to consider all of section 363 and to say that the primary concern will be adequate protection. Where the sale is in the ordinary course of business, particularly in a rehabilitation case, a flexible standard will apply, *but where the sale is out of the ordinary course of the debtor's business, then the no equity test should ordinarily be applied,* unless an alternative basis such as consent or a *bona fide* dispute concerning validity is present, and the sale should ordinarily be for cash. This interpretation is enforced by section 362(d) which would permit relief from the stay where there is no equity and the property is necessary to an effective rehabilitation (emphasis added).

2 Collier on Bankruptcy ¶ 363.07 at 363–26, 27 (15th ed. 1982).

Under the terms of the proposed sale, the debtor would receive $388,000.00 from the buyer plus the return of approximately $80,000.00 being held in escrow by the township for improvements, which would be released to the debtor upon the posting of new escrow by the buyer.[3] Accordingly,

---

**2.** Union National Bank and Trust Company of Souderton ("the bank"), the holder of an outstanding $50,000.00 letter of credit issued for the benefit of Hatfield Township, filed an objection to the proposed sale. However, the bank did not appear at the trial of the instant complaint.

**3.** In addition, the first mortgagee would, under the proposed agreement of sale, release the debtor's president and his wife from their personal guarantees of the loan obligation (N.T. 4/12/83 at 100).

there would be approximately $462,000.00 available for distribution to creditors if the proposed sale were consumated.[4] From those proceeds, the first mortgagee would receive nearly $440,000.00,[5] the second mortgagee, the holder of a mortgage in the amount of $125,000.00 (N.T. 4/12/83 at 98), would be entitled to the remaining funds and the third mortgagees, obviously, would get none of the proceeds.

■ We point out that the dearth of funds that would be available to the second and third mortgagees as a result of the proposed sale is not, in and of itself, the primary focus of our attention. Rather, the dispositive factor in our analysis is whether the interests of all the mortgagees are adequately protected to the extent of the actual values of those respective interests.[6] The actual value of each mortgagee's interest, in turn, can only be determined once the highest possible sales price for the subject property is determined. In other words, if the proposed sales price is the best price obtainable under the circumstances of a particular case, then the fact that junior lienholders may receive little or nothing from the proceeds of the sale would not, standing alone, constitute reason for disapproving the proposed sale.

■ The debtor contends essentially that the highest possible price that could be obtained for the subject property is $15,-520.00 per lot.[7] In this regard, Janet Pool, a real estate broker, testified on the debtor's behalf that the fair market value of the property in question, based on an income analysis approach, is $381,000.00 (N.T. 4/12/83 at 38), which comes to $15,240.00 per lot. On the contrary, Raymond Butera, a real estate broker and developer and one of the mortgagees in this case, testified that the subject property is worth $24,500.00 per lot (N.T. 4/12/83 at 128). In addition, Kenneth David, a realtor and a past Hatfield Township commissioner in charge of zoning and planning, testified that the property in question, using a comparable sales approach, has a fair market value of at least $24,000.00 per lot (N.T. 4/12/83 at 118).[8] After giving due consideration to the respective appraisals, we are convinced that $15,520.00 per lot is not, as the debtor maintains, the highest possible price for the subject property. We cannot, based on the present record, conclude that a minimum of $20,000.00 per lot is an unrealistic sales price even if we take into consideration the cost of making the necessary improvements and the fact that we are dealing with a bulk sale of twenty-five lots.

Furthermore, we are persuaded by the testimony of the debtor's president that, had the interest rates not been as high as they were in 1982, the debtor would have proceeded to build homes on the subject property in the $75,000.00 to $85,000.00 range.[9] In this regard, we note that the testimony given at trial was that the real estate market is presently improving and that real estate sales have generally picked up from 1982 (N.T. 4/12/83 at 62, 129). Accordingly, for the reasons stated above, we will deny the debtor's complaint.

---

**4.** *See* debtor's brief at 2.

**5.** *Id.*

**6.** The legislative history accompanying § 363(f) provides that a "[s]ale under this subsection is subject to the adequate protection requirement. Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale."
*See* H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 345 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

**7.** *See* debtor's complaint at ¶ 6.

**8.** None of the witnesses who testified as to the fair market value of the property in question were members of any organizations of real estate appraisers.

**9.** The testimony given at trial established that the standard used by builders is that the cost of a building lot should not exceed 25% of the gross sales price of a completed home built thereon. *See also* Exh. P–2 at 6. Therefore, if homes were constructed on the subject property at a price of $80,000.00 per home, then the "cost" of each lot would be $20,000.00.